HICKS *against* HOTCHKISS and others.

A discharge under the insolvent act of this State, passed *April* 12, 1813, (sess. 36. ch. 98., *N. R. L.* 460.) is not a bar to a suit here, upon a contract made, or debt contracted, between parties in another State, and residing there at the time.

It seems, that a discharge under the insolvent act, from debts contracted within this State *after* the passing of the act, is valid.

ON a re-hearing. The bill stated, that *Hezekiah S. Beach*, June 5th, and of *Connecticut*, now of the *West Indies*, on the 28th of July 21st. *October*, 1816, assigned to the plaintiff all the debt and sum or sums of money, whatsoever, due and owing to him from the firm of *W. S. & S. Hotchkiss*, (defendants,) of *New-Haven*, in the state of *Connecticut*, and from the defendants, *Goodrich & Deforest*, partners, of the same place, *in trust*, &c., giving the plaintiff a full power to demand and receive the same, &c. The debt, or demand, so assigned, was stated to amount to 2000 dollars, being the one *fourth* part of the proceeds of an adventure to the *West Indies*, in which *Beach*, *G. Peck of Connecticut*, and the two firms of *W. S. & S. H.*, and *G. and D.*, were equally and jointly concerned. The bill charged, that the entire proceeds of the adventure, amounting to 8000 dollars, were received by the firm of *W. S. & S. Hotchkiss*, in the fall of 1813, in *Rhode Island*, where the voyage ended. *G. & D.* and *Peck* received their shares of the proceeds; but *W. S. & S. H.* have not paid to *Beach* or the plaintiff his share of the proceeds ; and the plaintiff was informed that they had paid or accounted for such share to the defendants, *G. & D.*, so as to render them liable in equity for the amount. That due notice of the assignment to the plaintiff was given to the defendants, and payment demanded, and refused ; and the defendants, *W. S. & S. H.*, pretend that they have accounted for the share of *Beach* to *G. & D.*, who,

the plaintiff alleges, had no authority to receive it. That G. & D. insist that W. S. & S. H. are largely indebted to them, &c. *Prayer*, that the defendants may be decreed to account to the plaintiff for the moneys equitably due, with interest, &c., and for general relief.

The defendants, *W. S. & S. H.*, in their joint and several answer, admitted the material facts stated in the bill, as to the adventure and the parties' interests therein ; that the proceeds arrived at *Newport* in *November*, 1813, consigned to them, and were received by them. That G. & D. informed them, that they were authorized to receive *Beach's* share, and these defendants agreed to credit them with the amount, as soon as it should be freed from certain embarrassments then existing. That, on the 1st of *April*, 1816, these defendants stated a general account with G. & D., which they admitted to be correct, and in which they were credited with one half of the proceeds of the adventure, amounting to 3606 dollars and 57 cents, and for which G. & D. gave a separate receipt. That G. & D. have always acquiesced in the account, by which a considerable balance remained due to these defendants, which was unpaid. They admitted due notice of the assignment of *Beach's* share to the plaintiff; and which they refused to pay, because they had previously accounted for the amount, being 1803 dollars and 38 cents, to *W. S. & S. H.*

They alleged, that they were duly discharged as insolvent debtors, in the city of *New-York*, on the 12th of *August*, 1818, with the assent of two thirds of their creditors, under the act for giving relief in cases of insolvency, (1 *N. R. L.* 460. sess. 36. ch. 98.) and they insisted on their discharge.

The defendants *G. & D.*, in their answer, denied that they had ever received from *W. S. & S. H.*, who had the entire management of the adventure, the share of *Beach*, or

that it was placed to their credit, with their assent, in the account rendered by *W. S. & S. H.*, &c. &c.

Replications were filed to the answers, and proofs taken in the cause. Among the exhibits, was a power of attorney from *Beach* to *Deforest*, dated *April* 17, 1816, authorizing him to recover all claims; and accompanied with a letter from *B.*, requesting particularly that he would receive his claim of *W. S. & S. H.* At the bottom of the inventory of their debts exhibited by *W. S. & S. H.* to the Recorder, they stated, that one fourth of the proceeds of the adventure claimed by *Beach*, was duly credited and paid by them to *G. & D.*, and they denied that any thing was due from them to *B.*

*H. W. Warner* and *Boyd*, for the plaintiff. They cited 13 *Tyng's Rep.* 1. 4 *Wheat. Rep.* 209. 3 *Dallas*, 397. 9 *Johns. Rep.* 325. 16 *Johns. Rep.* 233. 251. 1 *Gallis. Rep.* 168. 377. 380.

*Ely* and *M'Coun*, for the defendants, *W. S. & S. Hotchkiss.* They cited 1 *Gallis.* 376. 381. 16 *Johns. Rep.* 238. 17 *Johns. Rep.* 44. 108. 18 *Johns. Rep.* 54.

*Griffin*, for the defendants, *Deforest & Goodrich.*

THE CHANCELLOR. The contract upon which the present demand is founded, was made in the state of *Connecticut.* In *July*, 1813, *H. S. Beach*, (whose interest the plaintiff represents,) *G. Peck*, and the defendants, being at *New Haven*, in *Connecticut*, and engaged in business there, became concerned in a commercial adventure to the *West Indies;* the cargo of the return voyage was consigned to the defendants *W. S.* and *S. Hotchkiss*, and delivered to them in *Rhode Island*, the latter end of the year 1813. It was shortly thereafter sold and converted into cash, and those consignees became responsible to the other parties for

1823.

HICKS
v.
HOTCHKISS.

June 5th.

1823.

Hicks
v.
Hotchkiss.

their proportions of the net proceeds; they continued all this time to reside at *New-Haven*, and none of the parties became inhabitants of this State, until 1815. The one fourth of the proceeds belonging to *Beach*, and received by *W. S. & S. Hotchkiss* for his use, amounted to 1803 dollars and 24 cents, and his right and title to those proceeds was assigned to the plaintiff, on the 28th of *October*, 1816, with authority to demand and receive them. The defendants, *W. S. & S. H.*, have never accounted for *Beach's* share; and the only defence set up which they have been able to establish, in point of fact, is their discharge, as insolvent debtors, from all their debts, by the Recorder of *New-York*, in *August*, 1818, under the general and permanent insolvent act of this State, of the 12th of *April*, 1813.

The only question in the case is, whether that discharge, under the circumstances, be a legal bar to the suit. The facts do not sufficiently warrant the conclusion, that the discharge was fraudulently procured, by concealing or denying the fact that *Beach* was a creditor at the time *H. & H.* exhibited to the Recorder an account of their debts and creditors. The denial of the existence of that creditor or debt, was not, at the time, necessary to the validity of the proceedings. The act of 1813, only required the assent of two thirds of the creditors, in value, to the petition, and the insolvents had signatures to that amount, without the assent of *Beach* or his assignee.

The act declared, that the insolvent debtor, upon his petition, in conjunction with two thirds of his creditors in value, and upon assigning over all his property, (except a few articles of necessity,) and complying with the requisitions of the act, should be discharged "from all his debts due at the time of the assignment, or contracted for before that time, though payable afterwards, except debts due or owing to creditors without the *United States*, who should not have petitioned for the insolvent's discharge, or have come in and accepted

a dividend of his estate from his assignees, unless two thirds of all the insolvent's debts, including foreign debts, should have been signed off according to the directions of the act, in which last case, foreign, as well as domestic debts, shall be discharged."

It is contended, that the discharge in question was no bar, inasmuch as no state can pass any law " impairing the obligation of contracts," and the discharge of the insolvents from their contract to pay *Beach*, without his consent and without having paid him, was an act of law impairing and destroying the obligation of the contract. If the discharge would have been valid, if the contract had been made in this State, yet it is insisted, that the contract being made out of the State, and between persons not at the time citizens of this State, the discharge is clearly void.

The question, upon this discharge, is of very grave import, and leads to an examination of the principal decisions on the constitutionality of these state insolvent laws.

The great and leading case on the subject, is that of *Sturges* v. *Crowninshield*, decided by the Supreme Court of the *United States*, in *February*, 1819. (4 *Wheaton*, 122.) The defendant, in that case, gave two promissory notes to the plaintiff, dated at *New-York*, the 22d of *March*, 1811, and in *February* following he was discharged from all his debts under the insolvent act of this State, of the 3d of *April*, 1811, entitled, " an act for the benefit of insolvent debtors and their creditors." He was afterwards sued in the Circuit Court of the *United States*, for the district of *Massachusetts*, upon one of those notes, and pleaded his discharge in bar. To this plea there was a demurrer, and the cause was carried up to the Supreme Court of the *United States*, and argued in *February*, 1819. Every topic of discussion, in respect to the policy, the origin, the necessity, and the construction of those parts of the constitution, which bear upon the question, and in regard to the powers of the general and state governments, to pass bank-

1823.

HICKS
v.
HOTCHKISS.

rupt and insolvent laws, and in respect to the history and character of such laws, was investigated and exhausted, and the argument on each side pressed with great talent and force.

In the opinion of the Court, as delivered by the Chief Justice, it was admitted, that until Congress exercise the power to pass uniform laws on the subject of bankruptcy, the individual States may pass bankrupt laws, provided those laws contain no provision violating the injunction in the constitution, not to impair the obligation of contracts. It was admitted, also, that the States might, by law, discharge debtors from imprisonment, as imprisonment was no part of the contract, but only a means of coercion; and that they might likewise pass statutes of limitation ; for such statutes relate to the remedy, and not to the obligation of the contract. It was further stated by the Court, that the insolvent laws, of far the greater number of the States, only discharged the person of the debtor, and left the obligation to pay in full force; and to this the constitution was not opposed. But in the judgment of the Court, a law which discharged the debtor from his contract, without performance, and released him, without payment, entirely from any future obligation to pay, impaired the obligation of that contract, and, consequently, the plea of a discharge, under the act of this State, of the 3d of *April*, 1811, was no bar to the suit on the notes given in *New-York*, on the 22d of *March*, 1811.

It is to be observed, that the act of 1811, was retrospective, and discharged the debtor upon his single petition, without the concurrence of any creditor, from all his pre-existing debts; or, in the words of a supplementary provision, (*Act of the 9th of April*, 1811, ch. 248.) from " all liability and responsibility, by reason of any bill, indorsement, contract, covenant, obligation or engagement, which the debtor might previously have drawn, made, entered into, or executed." This act manifestly impaired the ob-

ligation of such debts, and the application of the plain and intelligible words of the constitution to such a case, would seem to be inevitable. The debtor was, at once and for ever, released from all obligation to pay his debts, though the property he assigned might be worthless, and though he might afterwards be found in affluence.

So far as this decision has settled the construction of the constitution of the *United States*, it is to be received as the true construction ; for questions of that kind fall within the cognizance of the judicial power. The decisions of the Supreme Court of the *United States* upon questions arising upon the construction of the powers and authority of the constitution, must be definitive, and binding upon all the tribunals of the Union ; because the constitution has made their judgments and decrees final, and without appeal. Every decision by a Court in the last resort, in a case within its undoubted jurisdiction, must, from the necessity of the case, be absolutely binding. The proposition, that the State Courts are equally supreme, independent and absolute, in the consideration and decision of such national questions, strikes me as untenable. It would lead to the subversion of all order and subordination. There must be a paramount power, some where, in the organization of every political institution, or there is no government. The Supreme Court of the *United States*, on questions within its cognizance, is that power ; and if the State Courts were to undertake to disobey or elude its decisions, the consequence would be discord and confusion, or a dissolution of the national compact.

I should have deemed it my duty, therefore, to have maintained this doctrine, even if I had considered the application of a prohibition in the constitution to the discharge under the act of 1811, to have been a mistaken application. But this is not the case. The act of 1811, did impair the obligation of contracts to a most fatal and alarming extent. It was equivalent to a general re-

lease of every debtor in the State from all his then existing debts, without or against the will of all his creditors, provided he could only persuade some one of them to be so obliging as to prosecute him, and provided he was willing to assign over his then existing property. There never was a law that held out more alluring and more dangerous temptations to debtors to forget what they owed to good faith, and to disregard the moral obligation of contracts. Its effects upon the community were rapid and deplorable. The evils of it were contagious, and spread like a pestilence. The public became alarmed, and wise and good men and men of property were deeply excited. Petitions for the repeal of the act flowed in from every quarter to the next Legislature; and it was one of the first acts of the session of 1812, (sess. 35. ch. 8.) to abolish the law of the preceding year, without waiting to prepare another and better system in its stead.

I have not described the mischiefs of the act of 1811, beyond historical truth. We have, as authentic evidence of the fact, the report of the joint committee of the Senate and Assembly of the 6th of *February*, 1812. That report contained this strong declaration, that " experience had demonstrated the injustice, impolicy, and pernicious tendency of the act of 1811; that it had multiplied fraud and perjury, and that the dictates of justice and sound policy required its immediate repeal." The fate of such a law affords a monitory lesson; and it is, certainly, without any mixture of regret, that I have perceived that, under the authority of the case of *Sturges* v. *Crowninshield*, a great number of discharges, procured by means of the act of 1811, have been sacrificed upon the altar of the national justice. An insolvent law, discharging a debtor from his then existing debts, is a violation of vested right, injurious to morals, and dangerous as an example, and ought to be condemned.

But the case of *Sturges* v. *Crowninshield*, is not free

from difficulty as to the extent of its application. The act of 1811 was passed after the making of the contract, to which the discharge under the act was pleaded as a bar, and the counsel for the plaintiff raised the distinction between the case of a contract made before and after the passing of the act; and contended, that if the act was not unconstitutional and void as to future contracts, it was clearly so as to contracts existing when it was passed. The Chief Justice, however, did not take notice of that distinction; and all his reasoning went to illustrate and enforce the general principle in the constitution, that contracts should be inviolable; and that any law, releasing the party from his obligation to pay, impaired that obligation. The only part of the opinion that had an allusion to any such distinction, was that which declared that statutes of limitation and usury laws did not impair the obligation of contracts, provided they did not reach contracts already made when the laws were passed. But such regulations are not intended to affect the obligation of the contract. The one relates to the remedy, and prescribes the period of time which shall afford presumption of payment; and the other relates merely to the rate of compensation for the use of the money, or the delay of payment.

The Court, however, said, at the conclusion of their opinion, that it was " confined to the case actually under consideration ;" and that case was one in which the contract was existing when the law was passed. It must be admitted, that it is not very safe, to separate the reasoning of the Court, in any given case, from the facts to which the reasoning was meant to apply; and if there be any thing material or solid in the distinction, we may avail ourselves of it, without impairing the authority of such case. A decision is, strictly considered, an authority to the extent only of the facts which warranted it.

In *Mather* v. *Bush*, (16 *Johns. Rep.* 233.) decided by the Supreme Court of this State, in *May*, 1819, that dis-

1823.

HICKS
v.
HOTCHKISS.

tinction was taken, and very much relied on. The con-
tract was made in 1816, and both parties were citizens of
this State. The debtor was prosecuted to judgment, and
was then discharged, in 1817, under the general insolvent
act of 1813, and the Court set aside a *fi. fa.* issued after
the discharge, and held, that an insolvent law in force
when the contract was made, did not, in the sense of the
constitution, impair the obligation of that contract. They
held, that the parties to a contract have a reference to the
existing laws of the country where it is made, and are
presumed to contract in reference to those laws. The
law may be said to be a part of the contract; and it is
an implied condition of every contract, that the party shall
be absolved from its performance, if the event takes place,
which the existing law declares shall dispense with the
performance. The contract, in the opinion of the Court,
had no greater force than if the insolvent act had been in-
serted in it, and made part and parcel of the contract.

I do not perceive the very great force of this last argu-
ment; for if parties are to be supposed to contract in re-
ference to existing laws, they must be presumed to mean
laws made *in pursuance of the constitution.* But the ma-
teriality of this distinction between an insolvent act made
to affect past, and one confined to future contracts, had
been already perceived and acknowledged by the Judges
of other Courts. It was admitted by Ch. J. *Parker,* in
*Blanchard* v. *Russell,* (13 *Mass. Rep.* 1.) and by Mr. Justice
*Washington,* in *Golden* v. *Prince.* (5 *Hall's L. J.* 502.)
In this last case, the insolvent act of *Pennsylvania* was
passed after the making of the contract upon which the
defendant was sued; and the discharge which was pleaded
in bar, was overruled. It was held, that the law was un-
constitutional in relation to that particular case, because
it impaired the obligation of the contract by discharging
the debtor, to use the language of the learned Judge,
" from the payment of his debts, due or contracted before

the passage of the law." He admitted, that a law, prospective in its operation, under which a contract afterwards made might be avoided *in a way different from that provided by the parties,* would be clearly constitutional.

A great deal may be said against the policy of insolvent laws, which go to discharge the debtor absolutely from his debts, though they are prospective in their operation; and such considerations are proper for the legislative power, when passing upon such laws. Good faith should be earnestly taught, and religiously observed, not only on the part of government, but in the dealings of individuals with each other; *and the interference of the law to discharge a party from the obligation of his contract, fairly and freely made, without the consent of the party entitled to performance, and without performance, is, in itself, a strong measure, and of dangerous influence, and requires a pressing necessity to justify it.* In the language of the report, which I had the honour, in connexion with the Judges of the Supreme Court, to submit to the Legislature of this State, on the 22d of *January,* 1819, " a permanent insolvent act, made expressly for the relief of the debtor, and held up daily to his view and temptation, and when its main object is to set him for ever free from his debts, has a powerful tendency to render him heedless in the creation of debt, and careless as to payment. It induces him to place his hopes of relief rather in contrivances for a discharge, than in increased and severe exertions to perform his duty." I have no doubt that insolvent and bankrupt laws have an unfavourable effect upon the morals of the community; and that, though it may be a discouraging check to industry and enterprise, to subject the future acquisitions of a bankrupt or insolvent debtor to the payment of his debts, according to the rule of the *cessio bonorum* of the Roman law, the evils resulting from the practice of a complete release of the debtor, are much greater.

But these are questions of policy, properly addressed to the legislative power, and they have no direct concern with the judicial inquiry, as to the true construction of the prohibition, not to pass "laws impairing the obligation of contracts." There are many considerations which appear to me to be very embarrassing to the argument, in support of the proposition, that the insolvent law, operating upon contracts *in futuro*, is also unconstitutional and void, if it goes to discharge both the person and the future property of the debtor. A prohibition to impair by law the obligation of a contract, would seem, from the plain meaning of the expression, to refer to laws affecting existing contracts. All civil contracts are subject to the regulations of the lawgiver; and a contract cannot well create a civil obligation in a mode not permitted, and to an extent beyond that prescribed by the established law of the land, existing when the contract was made. The prohibition would not surely have prevented the passing the statute of frauds, declaring that no interest in land should thereafter pass by a parol contract, and that no person should be bound by a parol promise to answer for the debt of another. The Legislature have a right to prescribe, according to their sound discretion, the terms and conditions upon which persons shall be, thereafter, bound by their contracts. The Legislature may apply the principle of the *cessio bonorum*, and discharge the person of the debtor. This is conceded; and yet to diminish the extent of the remedy materially, would seem to impair the obligation of the contract. If this be denied, why may not the remedy be still further narrowed, and specific parts of the property exempted? This has been done, from time to time, as to articles of necessity; and what precise limits can we assign to the discretion of the Legislature? If they may exempt one article of property, why not another? If they may take away the remedy by a *ca. sa.*, why may they not take away the remedy by a *fi. fa.*? *Utor permisso—demo unum, demo etiam unum.*

All these things may be done without any difficulty, in respect to future debts, created after the regulations of the law ; but I should doubt whether even the remedy, in any point of view, or of any description, can be essentially diminished as to antecedent contracts.

The contemporary exposition of the constitution on this point, and the uniform practice under that exposition, appear to me to furnish a very strong argument against that construction, which would apply the prohibition to prospective insolvent laws. We have good reason to believe that the construction now under review, was not originally in the contemplation, either of the convention that made, or of the conventions which ratified the constitution.

An insolvent law, prospective in its operation, is constitutional.

Insolvent laws, to the extent of the act of 1813, existed, and were in use, when the constitution of the *United States* was adopted. No person supposed they were repealed by the adoption of the constitution. They have been kept in use ever since, without the suggestion of a doubt as to their validity. It did not occur to any person at that period, that Congress might and ought to pass bankrupt laws, discharging bankrupt merchants from their debts, and that the State Legislature could not pass or continue insolvent laws, discharging any other class of unfortunate debtors, upon the same terms, without a violation of civil and moral obligation. No objection had been raised, as far as I recollect, to the constitutionality of these insolvent laws, by the judiciary of this or of any other State, or by that of the *United States,* until the decision in *Sturges* v. *Crowninshield.* I have already alluded to the opinions of the Chief Justice of *Massachusetts,* and of Justice *Washington;* and I may add, the judicial opinions in *Adams* v. *Storey,* (6 *Hall's L. J.* 474.) and in the case of the *Farmers and Mechanic's Bank* v. *Smith,* (*ib.* 547.) as well as in several other early cases before the federal Court, referred to by Mr. *Hunter,* in his argument, in *Sturges* v. *Crowninshield,* to show that such laws were held to be valid. In this State there was a per-

manent insolvent act in existence when the constitution of the *United States* was adopted ; and I presume, and I think I know, it never occurred to any person at that period, that the law was overruled or affected by the clause in question. Judge *Chase*, and Judge *Paterson*, in *Calder* v. *Ball*, (3 *Dallas*, 386.) both declared, that if the prohibition in the constitution against *ex past facto* laws extended to laws affecting contracts as well as crimes and penalties, the other prohibition in the constitution, not to pass any laws impairing the obligation of contracts, would have been unnecessary or useless. But why useless, if the prohibition also applied to laws made to operate upon contracts *in futuro ?* Those learned judges evidently did not carry the construction to that extent. The act of this State, of *March*, 1788, was amended on the 13th of *February*, 1789, after the constitution was adopted, and the amendment assumes the act itself to be valid. We have, therefore, a usage of thirty years, founded on a contemporary and uncontradicted and continually acknowledged exposition of the construction. Such a settled, practical, contemporaneous construction, is evidence of universal and uniform acquiescence in that sense of the instrument which was assumed in the first instance ; and upon a constitutional question affecting most deeply the rights of property, the authority of law, and the powers of the State governments, such an exposition presses upon my mind with insurmountable weight. Whatever, therefore, might be the better opinion, if the question was *res integra*, and there had been no usage on the subject, I feel myself bound by a construction settled by such usage, except so far as it may have been directly controlled by a decision in point, made by the supreme judicial authority of the Union. I shall, therefore, follow the course adopted by the Supreme Court in *Bush* v. *Mather*, and consider the case of *Sturges* v. *Crowninshield* an authority to the extent of the facts in that case, and no further. It is an authority, then, to this extent, that *an insolvent law of*

*this State, discharging a debtor from his contract existing when the law passed, so that his future property could not be touched, is unconstitutional, and the discharge void.* That decision, then, does not reach the present case.

But the decision in *M'Millan* v. *M'Neill*, at the same term of the Supreme Court of the *United States*, (4 *Wheaton*, 209.) went a step further, and held, that a discharge under an insolvent law, existing when the debt was contracted, was equally void, and within the principle of the decision in *Sturges* v. *Crowninshield*. This was a case, however, of a discharge under the insolvent law of a different government from that in which the contract was made. The plaintiff resided in *South Carolina*, and gave a custom house bond, in *November*, 1811, with the defendant, also a citizen of *S. C.*, as his surety. The bond was paid, after suit and judgment, by the defendant, in 1813. The plaintiff, afterwards, removed to *New-Orleans*, and was discharged in 1815, both as to person, and present and future property, from all his debts, under an insolvent law of the State of *Louisiana*, passed in 1808. He was sued in *Louisiana*, in 1817, by *M'Niell*, and pleaded his discharge under the *Louisiana* act, and the plea was overruled on demurrer, by the Circuit Court of the *United States*, for that district, and the judgment affirmed by the Supreme Court of the *United States*. The Court said, that the circumstance of the State law, under which the debt was attempted to be discharged, having been passed *before* the debt was contracted, made no difference in the application of the principle of the former decision.

Here, also, the principle of the decision seems to be more general and extensive than the facts in the case required. Do the Court mean to say, that if the debt had arisen in *Louisiana*, between persons residing there, the discharge, under a pre-existing law, would have been equally unavailing? Are we bound to regard this decision, as an authority to that extent? If we are, then there is an end of all State

insolvent laws, that go to extinguish the remedy against the future property of the debtor, and insolvent laws are reduced to the level of the *cessio bonorum* of the civil law. But it is certainly best and safest, for the reasons which have been already mentioned, to confine the authority of this case, *to the facts upon which the decision was made*, and to consider the Court as intending only to decide, that a debt created in *South Carolina*, between citizens of that State, was not to be discharged, and the remedy extinguished, by the discharge of the debtor, under the insolvent law of another State. If the suit had been brought in the Court of another State, or another district, than that in which the discharge was obtained, there would have been no difficulty in acceding to the decision; for it is well settled, that a debt, contracted in one country, cannot be discharged by the bankrupt laws of another, so as to bar a suit in the country where the debt was contracted. But we have always considered a discharge, under our own insolvent laws, (assuming them, of course, to be constitutional,) to be a bar to suits brought here upon antecedent contracts, wherever made. (*Penniman* v. *Meigs*, 9 *Johns. Rep.* 325.) The insolvent act of 1813, expressly extended to foreign contracts, and our Courts would be bound to regard as valid the discharges under it, even as to such contracts, unless the law itself be against the constitution of the *United States*. But it is impossible, upon a comparison of facts, to avoid considering the case of *Penniman* v. *Meigs*, as overruled by that of *M'Millan* v. *M'Neill*. If the discharge in *Louisiana* would have been valid, and free from any constitutional objection, in a Court of that State, it would have been equally so in a Court of the *United States* sitting in that State. The laws of the several States (except where the constitution and laws of the Union shall otherwise require) are to be regarded, as well upon principles of comity and policy, as under the judicial act of Congress, as rules of decision in the Courts of the *United States*, in

cases where they apply. But it has been adjudged that a discharge in *Louisiana* is unconstitutional and void, so as not to be a bar even in *Louisiana*, in respect to a debt contracted in another State ; and it necessarily follows, that the discharge of *W. S. & S. Hotchkiss*, under the insolvent act of this State, is not a bar, even in this State, to an action upon a contract made or debt contracted in *Connecticut*, between parties residing there at the time.

The subsequent case of the *Farmers and Mechanic's Bank of Pennsylvania* v. *Smith*, (6 *Wheaton's Rep.* 131.) declared, that though the parties were citizens of the same State, when the contract was made, and continued such to the bringing of the suit, it made no difference in the application of the principle of the former decisions, as the constitution of the *United States* was equally binding on all the Courts and all the citizens. But here also the facts were more narrow than the general doctrine of the Court, for the insolvent act, in that case, was passed *subsequent to the contract* ; and I must once more advert to the rule, that a case is no authority beyond the facts that called for the decision.

It results, then, from the decisions at *Washington*, that valid discharges, under an insolvent act, must, at all events, be confined to the case of *debts contracted after the passing of the act, and which were contracted within this State*. Whether the principles, declared in the case of *Sturges* v. *Crowninshield*, are to be more extensively applied, so as to reach and control this remaining power of the insolvent act, I am not prepared to say. It would not be in my power, according to my present view of the subject, to carry these principles to that extent. It is sufficient for the present, to observe, that the case is not an authority for that purpose ; and I willingly leave the further application of its doctrine to the consideration and judgment of the Supreme Court of the *United States*, whose decisions, even when we do not entirely assent to

them, never fail to excite reverence, as well as command obedience. And, in this concluding period of my judicial life, I cannot do better than to add my humble testimony to the character which that Court sustains, and to the confidence which it ought to inspire. It has been frequently called to the examination of national questions of great difficulty, extreme delicacy, and of infinite importance; and it is in the habit of discussing them, not only in a masterly manner, and with magnanimous firmness, but with a very engaging moderation, a visible anxiety, and profound meditation. Principles arising on constitutional and public law, have been defined, explained, and enforced, with such clearness of perception and depth of reasoning, and such a fitness and force of illustration, that if we have not been able to concur in all their conclusions, we have never ceased to admire the strength and temper of the decisions.

The following order was entered :

" It is ordered, that the decree pronounced at the first hearing, in respect to the two defendants, *W. S. & S. Hotchkiss,* be vacated, and that they account to the plaintiff for the sum of 1803 dollars and 28 cents, the amount admitted to have been received for *H. S. Beach,* together with interest thereon, from the 1st of *January,* 1814, and that they pay to the plaintiff his costs as against them, and that the bill, as to the other defendants, be dismissed, with costs."