## Case No. 13,245.

### SPOONER v. McCONNELL et al.

[1 McLean, 337.] [1]

Circuit Court, D. Ohio. Dec., 1838.

TERRITORIES — STATES — CONSTITUTION — SOVEREIGNTY—RIGHT TO TAX—WATERS—RIGHT TO NAVIGATE—DAMS—INJUNCTION.

1. Some parts of the ordinance of 1787, for the government of the Northwestern Territory, were designed temporarily to regulate the government of the territory.

[Cited in Astrom v. Hammond, Case No. 596.]
[Cited in Chandler v. Douglass, 8 Blackf. 12.]

2. These were necessarily abolished on a change from a territorial to a state government.

3. Other parts were designed to be permanent, and were sanctioned by compact.

[Cited in brief in McCrea v. U. S., 93 Ill. 32–34.]

4. These were comprised in six articles, which were declared to be unalterable, except by common consent.

5. Some of these, however, being guaranteed in the federal constitution, subsequently adopted, may be considered as practically annulled.

6. And any provisions of the ordinance which are repugnant to the constitution of Ohio, may be considered as also annulled.

[Cited in Sarah v. Borders, 4 Scam. 349.]

7. The people of the state adopted the constitution, and it was sanctioned by congress, so that here was the common consent required by the compact, for the abrogation of any of its provisions.

8. But the article respecting the navigableness of certain waters and the carrying places between them, remains without modification; and also the article which prohibits slavery.

[Cited in Palmer v. Cuyahoga Co. Case No. 10,688; Jolly v. Terre Haute Drawbridge Co., Id. 7,441.]
[Cited in Benjamin v. Manistee Imp. Co., 42 Mich. 634, 4 N. W. 486; Jarrot v. Jarrot, 2 Gilman, 8; Moore v. Sanborne, 2 Mich. 523. Cited in brief in Myers v. City of St. Louis, 82 Mo. 370.]

9. These stand unrepealed, and others, unless they shall be considered as repealed by implication.

10. They are not incompatible with state sovereignty.

[Cited in Wisconsin River Imp. Co. v. Manson, 43 Wis. 263.]

11. The state has agreed not to tax the public lands, nor until five years after they shall have been sold, but this does not impair its sovereignty.

12. An incorporation of a company to improve the navigation of a river, takes such river, from the action of ordinary legislation, but this is not incompatible with state sovereignty.

[Cited in La Plaisance Bay Harbor Co. v. City of Monroe, Walk. Ch. 167.]

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

13. The right to tax still exists as fully as ever, but some of the objects of taxation may be withdrawn by compact; and so as it regards legislative action on certain rivers.

[Cited in brief in Harmon v. Chicago, 140 Ill. 381, 29 N. E. 732.]

14. Admitting a state into the Union, on an equal footing, with the original states, does not mean, that its powers, legislative, judicial, and executive, shall be exercised to the same extent and, in the same mode as all the other states.

15. In this respect, the states are unequal, as perhaps, the powers of no two states, are exercised in the same mode and to the same extent.

16. They are equal, as being alike free in the formation of their constitution, and in the exercise of the powers of government under such restrictions and limitations as each may have voluntarily imposed on itself. And in the people of each having the power to modify or change their constitution at discretion.

17. The federal government is one of limited powers, but sovereign within the powers delegated.

18. But the sovereignty in this country resides with the constituency, and not with the functionaries of government.

19. The people of the states are the constituency of the federal as well as of the state governments, and they may alter the constitution of the federal, and of their respective state governments.

20. Compacts are as obligatory upon states as upon individuals. And the fact of their entering into compacts, which bind them, shows that they are free.

[See Bennett v. Boggs, Case No. 1,319.]

21. The provisions of the ordinance in regard to certain navigable streams and the carrying places between them, do not prohibit the legislature of the state from improving the navigation of such rivers and carrying places.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867.]
[Cited in Commissioners v. Withers, 29 Miss. 21.]

22. Neither the rivers nor the carrying places can be obstructed, but must remain free; but if the legislature with its funds, or through the instrumentality of companies, should improve the navigation of the rivers by canals or otherwise, and the carrying places, by canals, railroads, or turnpike roads, tolls may be charged for the increased facilities.

[Cited in Griffing v. Gibb, Case No. 5,819; Huse v. Glover, 15 Fed. 299; Id., 119 U. S. 549, 7 Sup. Ct. 316.]
[Cited in State v. White Oak River Corp. (N. C.) 16 S. E. 332.]

23. An obstruction such as natural falls, &c. does not destroy the character of the river above them, if it be navigable.

24. No individual has a right to prosecute, in his own name, for a public nuisance.

25. He cannot so prosecute, unless the act complained of, be a private nuisance to himself.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; Illinois & St. L. R. & Canal Co. v. St. Louis, Id. 7,007.]
[Cited in Attorney General v. Chicago & N. W. Ry. Co., 35 Wis. 539; Spangler's Appeal, 64 Pa. St. 387.]

26. Courts of chancery will not interfere by injunction to prevent a threatened wrong, unless the danger is imminent, and the injury is irremediable in any other form.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; Parker v. Winnipiseogee, C. & W. Co., 2 Black (67 U. S.) 553; Chicago &

A. Ry. Co. v. New York, L. E. & W. R. Co., 24 Fed. 519.]

27. The right set up by the complainant, as a citizen of the United States, to navigate the above waters, is an abstract right, and such an one, as chancery cannot protect from violation.

28. He does not state that he is engaged in navigating the Maumee, which he charges, the defendants threaten to obstruct, by the construction of one or more dams, but merely relies on his right to do so, which may never be exercised.

29. Chancery does not deal with abstractions or contingencies, but with practical rights and to prevent impending wrongs.

[Cited in Pierpont v. Fowle, Case No. 11,-152.]

30. The complainant alleges, generally, that he will be injured in his property, by the construction of the dams, and on this ground prays an injunction; but he does not show how he will be injured.

31. This is necessary, that the court may judge whether the wrong complained of, entitles him to an injunction.

32. Every wrong done, in this way on which an action may be sustained, will not entitle a party to an injunction.

33. The facts must present a case, which cannot be adequately redressed, in any other form.

[34. Cited in U. S. v. Bain, Case No. 14,-496, to the point that, notwithstanding the ordinance of 1787 declared the navigable waters of the Northwest Territory should be "common highways, and forever free" yet the Ohio legislature had a right to charter a canal company, which company obstructed by a dam the navigation of the Maumee river.]

[Cited in Macomber v. Nichols, 34 Mich. 218.]

[This was a bill in equity by Lysander Spooner against Alexander McConnell and others. Heard on motion for an injunction.]

Mr. Swayne, for complainant.

Wright & Harris, for defendants.

Before McLEAN, Circuit Justice, and LEAVITT, District Judge.

McLEAN, Circuit Justice. This is an application for an injunction by the complainant, who is a citizen of Massachusetts, and who represents himself to be the proprietor of a tract of eighty acres of land, situated at the head of the rapids, above the Maumee bay, and bounded by the Maumee river, north; and also of a certain island in said river, opposite the above tract, containing two and fourth-fifths acres, in Wood county, and state of Ohio. He states that during a great part of the year, the river is navigable from the head of the rapids to Fort Wayne, a distance of one hundred and twenty miles. That a steam boat and other vessels ply between these points; and that this part of the river has been navigated and used as a principal thoroughfare for the transportation of merchandize and articles of produce, from the first settlement of the country. That around the rapids, which are about sixteen miles in length, there is a portage that connects with the Maumee bay, which is navigable for steam boats and other vessels, that ply upon the lake. That this river leads into the St. Lawrence, through Lake Erie, and is within the country formerly called the Northwestern Territory; and to which the ordinance of the 13th of July, 1787, applied. That among certain articles of compact contained in said ordinance, and which are declared to be unalterable, except by common consent, it is declared "the navigable waters leading to the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the said territory as to the citizens of the United States and those of any other state, that may be admitted into the confederacy, without any tax, impost, or duty therefor." That by an act of congress entitled an "Act providing for the sales of the lands of the United States in the territory north-west of the river Ohio, and above the mouth of the Kentucky river," passed the 18th May, 1796 [1 Stat. 464], this article of the compact is recognized and affirmed. And that in making the surveys and sales of the public lands, the bed of the Maumee river has never been included. The complainant also states that the legislature of Ohio, the 3d March, 1834, passed an act entitled "An act to authorize the locating and establishing so much of the line of the Wabash and Erie Canal, as lies within the state of Ohio; and to authorize the selection, location, sale, and application of the proceeds of the sales of its lands" [Vol. 32, Laws Ohio, p. 308]; under the authority of which law, and other acts of the legislature, which provided that a navigable canal shall be constructed, a canal has been located from the west boundary of Ohio, to the mouth of the Maumee river, the construction of which is in active progress. That the canal commissioners who superintend the work under a pretence of a right in the state of Ohio to control and at her discretion, obstruct the navigable rivers within the limits of the state, are about to erect one or more dams across the Maumee river, above the rapids, for the purpose of supplying the above canal with water. The complainant further represents, that he purchased the property above mentioned, situated at the head of the rapids, at a very large price, with a view to the benefits of the navigation of that part of the river which is above the rapids; and which he alleges, is secured to him by the ordinance, the law of congress cited, and the constitution of the United States. That there is an extensive water power on his property. That two extensive saw mills and one flouring mill have already been erected thereon, and it was his expectation that many others would speedily be erected, were it not for the dam or dams which the defendants threaten to build. That, although the dam or dams intended to be erected, are some miles above his property, yet the effect would be greatly to obstruct, if not entirely to prevent the navigation of the river, which would materially lessen, if it should not wholly destroy the value of his property. And, as a

citizen of the United States, he claims a right to navigate the river, &c. He prays, therefore, that an injunction may issue, &c. At the last term, an injunction having been previously allowed nisi, cause was shown by the defendants, and the case was fully argued on both sides; and, as the principles involved are deeply interesting to those states which have been formed within the limits of the Northwestern Territory, and were for the first time raised for judicial examination in the federal tribunals, the cause was continued under advisement to the present term.

There are two grounds on which the complainant rests his right, both of which must be sustained to entitle him to the prayer of his bill: (1) He must show that the compact in the ordinance is in force. (2) That under the circumstances of the case, and in the form presented, he is entitled to the interposition of the court.

These positions have been earnestly and ingeniously controverted by the counsel for the defendants; and it becomes necessary, carefully to examine them. The ordinance was passed before the adoption of the federal constitution. It was entitled "An ordinance for the government of the territory of the United States, north-west of the river Ohio." Many of its provisions were temporary in their nature, having for their object the organization and operation of a territorial government. Others assume the solemn form of a compact, between the original states and the people and states in the territory, which were to remain forever unalterable, unless by common consent. These were comprised in six articles, the first of which provided that no person should be molested for his religious sentiment, or his mode of worship. The second secured the benefits of the writ of habeas corpus; trial by jury; the right of representation in the legislature; that crimes, unless capital, should be bailable: against the infliction of cruel punishment; the sacredness of private property, and of private contracts. The third article declared that schools and the means of education should be encouraged, and that good faith should be observed towards the Indians. The fourth article declares that the states which may be formed in the territory, shall forever remain a part of the confederacy, subject to the Articles of Confederation. That the inhabitants shall be liable to pay a part of the federal debt, according to a just apportionment. That no tax should be imposed on the lands of the United States, or any interference in their sale by the federal government. That non-resident holders of land should not be taxed higher than residents; and then it is declared, "that the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of said territory as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any

tax, impost, or duty therefor." The fifth article relates to the boundaries of the states to be formed in the territory, and what number of inhabitants shall entitle them to be admitted into the Union, on an equal footing with the original states. The sixth article declares "that there shall be neither slavery nor involuntary servitude in the territory, otherwise than in the punishment of crimes whereof the party shall have been duly convicted." In the act of cession of this territory by the state of Virginia to the United States, among other conditions, it is declared, that it should be laid out and formed into states, &c. which shall be distinct republican states, and admitted members of the Federal Union, having the same rights of sovereignty, freedom and independence as the other states. Some of the provisions of the compact contained in the ordinance were subsequently guarantied by the federal constitution. And so far as this guaranty extends, it may be considered, practically, as superceding the ordinance. This remark applies to that provision of the constitution which declares, that the new states shall be admitted into the Union with the same rights of sovereignty as the original states, the rights of conscience, the inviolability of contracts, &c. That this ordinance was obligatory in all its parts at the time of its adoption, no one can doubt: and the only enquiry now is whether, by the adoption of the federal constitution, the constitution of the state, or by any other means, it has been superceded or annulled, in whole or in part. The change from a territorial government to that of a state, necessarily abolished all those parts of the ordinance which gave a temporary organization to the government; and also such parts as were designed to produce a certain moral and political effect. Of the latter description were those provisions which secured the rights of conscience, which declared that education should be encouraged, that excessive bail should not be required, &c. And it may be admitted that any provision in the constitution of the state, must annul any repugnant provision contained in the ordinance. This is within the terms of the compact. The people of the state formed the constitution, and it was sanctioned by congress: so that there was the "common consent," required by the compact to alter or annul it. But in regard to the great question in this case, as to the navigable waters, the state constitution purports to make no alteration; and if the ordinance in this part be annulled, it must be done by implication; and on this ground the motion for an injunction is resisted. It is insisted that if effect be given to this provision of the ordinance it is restrictive of the sovereign power of the state; and is repugnant not only to the constitution of the state and the constitution of the United States, but to the act of congress which declares that the state of Ohio shall be admitted into the Union, on an equal footing with the original states. If this position be correct, it must be fatal to the plaintiff's right.

At this stage of the controversy it would be a sufficient answer to this argument to say, that the legislative power of the state has not, expressly, authorized the defendants to obstruct the navigation of the Maumee. Under the laws of the state they have authority to superintend the construction of public works, and of the canal stated; and when necessary to the work, to appropriate private property to public use; but as their authority does not expressly extend to the obstructions threatened, it cannot be so construed in opposition to even a doubtful right under the compact. And this view is greatly strengthened by the positive action of the legislature. In all cases, it is believed, where they have authorized a bridge to be built, or a dam to be constructed over a navigable stream, special provision has been made to preserve the navigation free from obstruction. But the case has not been argued upon this narrow ground, nor are the court disposed to rest their opinion upon it.

It is a well established principle, that no political change in a government, annuls a compact made with another sovereign power or with individuals. The compact is protected by that sacred regard for plighted faith, which should be cherished alike by individuals and organized communities. A disregard of this great principle would reject all the lights and advantages of civilization, and throw us back on the age of vandalism. This compact was formed between political communities and the future inhabitants of a rising territory, and the states which should be formed within it. And all who became inhabitants of the territory made themselves parties to the compact. And this compact so formed could only be rescinded, by the common assent of those who were parties to it. When application was made to congress by the people of the eastern part of the territory, to authorize the call of a convention to form a constitution, modifications of certain provisions of the compact were proposed, some of which were embodied in the constitution subsequently formed, and others of them, after various alterations, were also inserted. But that provision of the compact which declared that the navigable waters falling into the St. Lawrence and the Mississippi, and the carrying places between them shall be common highways and forever free, &c., was not proposed to be modified. By an act of congress of the 18th May, 1796, which provided for the sale of the lands of the United States in the territory, it is declared "that all navigable rivers, within the territory to be disposed of by virtue of the act, shall be deemed to be and remain public highways." And all the surveys made on such rivers were bounded by them, and the beds of the rivers were never included in the surveys nor sold to individuals. From this act of congress and these surveys it clearly appears, that the navigable waters within the territory were considered by one party to the

compact, as declared by that instrument, public highways. Is there any thing in the constitution of the state, which by implication must be held repugnant to this part of the compact. The state has been admitted into the Union on an equal footing with the original states. And yet the state is bound by compact not to tax the lands of the United States, nor until the expiration of five years after they shall have been sold. The power to tax is an incident to sovereignty. Does this exemption take away or lessen this power. If it does, in the sense contended, then the state of Ohio was not admitted into the Union, with the same powers of sovereignty as the original states. This consequence is not obviated by the fact, that this was a restriction imposed, with the consent of the state, for an equivalent. If it be an abridgment of the sovereign power of the state, the objection stands in its full force. The compact not to tax was the voluntary act of the people of the state, but not more so than was the compact by the same people that the navigable waters should be common highways. And this exemption from taxation is as much a restriction on the exercise of the sovereign power, as the exemption of the navigable streams from obstruction by the same power. The right to authorize works on a navigable stream, which may, to some extent, obstruct its navigation by the sovereign power of a state, is not less clear, on general principles, than the right to tax. By compact with the federal government, the national road, that lies within the state, is to be kept in repair by tolls imposed by the state for that purpose. The state cannot, under this compact, vacate this road, as it may all public roads established by its authority; and does this compact abridge the sovereignty of the state?

By the eighth article of the treaty of peace made with Great Britain, in 1783, the "navigation of the river Mississippi from its source to the ocean," it is declared, "shall forever remain free and open to the subjects of Great Britain and the citizens of the United States." A part of this river was within the established boundary of the United States, and did this compact abridge the sovereignty of the Union? If the state of Ohio grant a charter to a company to improve the navigation of a certain river, and authorize them to charge a toll, this would withdraw such river from ordinary legislation, but would it affect the sovereignty of the state? It is not unusual for independent governments to stipulate, that the navigation of certain rivers within the territories of each, shall be common to the subjects of both governments. Individuals are free to do that which may be done lawfully, but by a compact they may stipulate that they will not do certain things, and does this destroy their agency? On the contrary, does not the obligation of the compact or agreement voluntarily formed, show their power and regu-

late their rights? The same may be done under certain restrictions, by the people of a state. The terms, "sovereign power of a state," are often used, without any very definite idea of their meaning, and they are often misapplied. Prior to the formation of the federal constitution, the states were sovereign in the absolute sense of the term. They had established a certain agency, under the Articles of Confederation, but this agency had little or no power beyond that of recommending to the states, the adoption of certain measures. It could not be properly denominated a government, as it did not possess the power of carrying its acts into effect. The people of the states, by the adoption of the federal constitution, imposed certain limitations in the exercise of their powers which appertain to sovereignty. But the states are still sovereign. They are bound by the compact not to exercise certain powers which they have delegated to the federal government, and the citizens of the state are bound to respect and obey the powers thus delegated. But this compact, or federal constitution, was voluntarily formed by the people of the states, in their sovereign capacity, and may be changed, at their pleasure, in the mode provided.

The sovereignty of a state does not reside in the persons who fill the different departments of its government; but in the people from whom the government emanated, and who may change it at their discretion. Sovereignty, then, in this country, abides with the constituency and not with the agent. And this remark is true, both in reference to the federal and state governments. If the people of a state, in their sovereign capacity, enter into a compact, either from motives of sound policy or for a valuable consideration paid, that certain lands within the state shall be exempt from taxation, or that certain navigable rivers shall remain unobstructed, the sovereignty of the state is no more affected, than it is by every act of incorporation, where exclusive privileges are given to a company or an individual. Certain objects on which the sovereign power may act are, by its own consent, withdrawn from its action; but this does not divest the state of any attribute of its sovereignty. If certain lands be exempt from taxation, the general power to tax is not affected; and so as to any exclusive right or privilege which is vested by compact or act of incorporation. A state cannot divest itself of its essential attributes of sovereignty. It cannot enter into a compact not to exercise its legislative and judicial functions, or its elective rights; because this would be to change the form of government which is guaranteed by the federal constitution. But it is earnestly contended that the rights asserted by the complainant, are wholly incompatible with the sovereignty of the state, and with the provision that the state was admitted on an equal footing with the original

states. Does this provision mean, that the new state shall exercise the same powers and in the same modes, as are exercised by any other state. Now this cannot be the true construction of the provision, for there cannot be found, perhaps, any two states in the Union whose legislative, judicial and executive powers are in every respect alike. If the argument be sound, that there is no equal footing short of exact equality in this respect, then the states are not equal. But if the meaning be, that the people of the new state, exercising the sovereign powers which belong to the people of any other state, shall be admitted into the Union, subject to such provisions in their fundamental law as they shall have sanctioned; within the restrictions of the federal constitution, then the states are equal. Equal in rank, equal in their powers of sovereignty; and only differ in their restrictions, which, in the exercise of those powers, they may have voluntarily imposed upon themselves. Thus a state may, in her constitution, prohibit the legislature from incorporating banks, or in fact from passing any act of incorporation; and yet this state would be admitted into the Union on an equal footing with the other states. The same powers were exercised in forming a constitution, but in the distribution of the powers of the state government they were not given to the same extent, nor were they to be exercised in the same manner. But this produces no inequality. The states are equal, inasmuch as each has, by its own voluntary will established its own government, and has the power to alter it. This is the principle on which the state governments are established, and consequently they all stand upon an equal footing. They have the same basis; have been formed according to the will of the people, and may be changed at their discretion. If then, there is nothing in the constitution of the state which is repugnant to the compact in the ordinance in relation to navigable waters, and the parties to the compact have in no form annulled it, and it is not inconsistent with that equality which the state of Ohio claims with the original states, it follows that this compact is in full force, and is a subject of judicial cognizance.

The sixth article of the compact prohibits slavery. The constitution of the state also prohibits it. Now notwithstanding this inhibition in the constitution. the people of the state in convention. might so alter the constitution as to admit slavery. But does not the compact prevent such an alteration without the consent of the original states? If this be not the effect of the compact, its import has been misconceived by the people of the state generally. They have looked upon this provision as a security against the introduction of slavery, even beyond the provisions of the constitution. And this consideration has drawn masses of population to our state, who now repose under all the guaranties which

are given on this subject by the constitution and the compact. The provision of the compact in regard to slavery rests upon the same basis, as that which regards the navigable waters within the state. They are both declared to be unalterable, except by common consent. But it is contended that congress having made a donation of lands to aid in the structure of this canal on condition that its navigation shall be free to the United States for the transportation of troops and munitions of war; and as the canal can be of no use without the water of the Maumee, it must follow that the provisions of the compact, as it regards this river, are annulled by the assent of both parties.

This argument would have great force, if it were impracticable to draw the necessary water for the canal from the river, without materially obstructing its navigation. This is not pretended. And if a sufficient supply of water may be drawn from the river, without injury to its navigation, it would be a most unreasonable implication to hold, that the compact, in regard to this river is annulled or was intended to be annulled. It is insisted that the Maumee river above the falls is not embraced by the compact. That by the common law rivers were only held to be navigable as far as the tide ebbed and flowed; and that by analogy this principle may be applied in this country to a river so far as its navigation is continuous, but no further. That in this view the obstruction of the falls of the Maumee must terminate its navigableness. If this position be correct, the navigation of the St. Lawrence, and the waters connected with it, terminate at the falls of the Niagara. And if the same rule were applied to our rivers generally, it would do violence to the common understanding of the country, and contradict the daily demonstrations which are every where witnessed. In England, where the common law rule on this subject prevails, the rivers are of no great length; and they are not in fact, navigable above the flowing of the tide. Neither this rule nor any principle drawn from it, has been applied to rivers in this country. Obstructions do often occur on navigable rivers, without changing their character; and where a river, like the Maumee, affords a continuous navigation for steam boats one hundred and twenty miles above an obstruction, two thirds of the year, it must be held navigable, within the meaning of the compact. The fact of navigableness may be proved, like any other fact in the cause. and for the purposes of the injunction, may be considered as proved by the oath of the complainant. The supreme court of this state in the case of Hogg v. Zanesville Canal & Manuf'g Co., 5 Ohio, 410, had occasion to examine the point now under consideration. That was an action of trespass, in which the plaintiffs claimed damages for the loss of a boat and cargo in crossing a dam over the Muskingum river, which the legislature had authorized the de-

fendants to construct, but they were required to make and keep in repair a lock in the dam of certain dimensions, which would afford a safe passage for boats. This lock had fallen out of repair, in consequence of which the loss was suffered of which the plaintiffs complained. In their opinion the court say, "to the validity of certain statutes as affording a protection to the defendants, the plaintiffs object on the ground that they interfere with the ordinance, &c." This portion of the ordinance of 1787 the court say, is as much obligatory upon the state of Ohio as our own constitution. In truth it is more so; for the constitution may be altered by the people of the state, while this cannot be altered without the assent both of the people of this state and of the United States, through their representatives. It is an article of compact, and until we assume the principle that the sovereign power of the state is not bound by compact, this clause must be considered obligatory. Certain "navigable rivers" in Ohio are "common highways." Of this character is the Muskingum river. Every citizen of the United States has a perfect right to its free navigation. A right derived, not from the legislature of Ohio, but from a superior source. With this right the legislature cannot interfere. In other words they cannot by any law which they may pass, impede or obstruct the navigation of that river. That which they cannot do directly they cannot do indirectly. If they have not themselves the power to obstruct or impede the navigation, they cannot confer this favor upon an individual or a corporation.

On the part of the complainant it is insisted, that the compact is violated if the legislature authorize the construction of any work, on a navigable stream, though it may improve its navigation. That a dam across the Maumee, though constructed with a lock, would delay and therefore obstruct the navigation. On the other hand the defendants' counsel insist, that the legislature may improve the navigation of any river in the exercise of their discretion, and that it is for them to determine what shall amount to an obstruction. That this is not a judicial question but one of expediency, which must be determined by the law making power. If the compact be in force, if it secure to the public, and every citizen, a right to the unobstructed navigation of the navigable rivers within the state, the judicial power is bound to recognize this right. And there can be no more difficulty in this than many other cases of daily cognizance in courts of justice. A court or jury must also decide from facts, whether an injury complained of amounts to a nuisance either public or private. And in the present case, the court can decide whether the acts threatened to be done by the defendants, would be injurious to the public and to the complainant in particular; and whether they violate the compact. The provisions of the ordinance had reference to the navigable

rivers and the carrying places, as they then were. And in that state they were to remain free, without tax, &c. But this does not prevent the legislature from improving the navigation of rivers and the carrying places between them. Such improvements can in no sense be considered as repugnant to the ordinance, but in promotion of its great object. And it would seem to be no violation of the compact if the legislature should exact a toll, not for the navigation of the rivers in their natural state, but for the increased facilities established by the funds of the state. The carrying places between the navigable points at the date of the compact, were in their natural state. No way had been opened for a solitary traveller, much less for purposes of commerce. In this wild and unimproved state, neither the territorial nor state legislature could prohibit the passage over these carrying places, nor impose a tax on travellers or merchandize for passing over them. But if the legislature with the funds of the state, or through the instrumentality of an incorporated company, should construct a canal, a turnpike road or a rail road, connecting the navigable parts of these rivers, it could be no violation of the ordinance to exact a toll for the use of these ways. This would not impair any right given by the compact, but would require a compensation for a benefit conferred. And it would be no sufficient answer to this, to say that the traveller or transporter of produce or merchandize had a right to thread his way through the unbroken forests, and therefore these must be permitted to remain in their natural state. Navigable rivers and the carrying places between them, are placed on the same footing by the compact; and the only difference between them is, the rivers have established channels, whilst the carrying places are unmarked. They are both in their natural condition, and the state, it would seem, is no more prohibited from improving the navigation of the rivers than the carrying places between them. And if a toll may be charged, for the increased facilities in the one case, for the same reason it may in the other. We therefore can entertain no doubt, that the legislature may improve, at their discretion, the navigable rivers of the state, and authorize the construction of any works on them which shall not materially obstruct their navigableness. They may build a dam over the Maumee, if it shall be so constructed with a lock or otherwise, as not materially to obstruct its navigation.

The counsel for the complainant contend that the United States still hold the proprietary right, in the streams of the state. And on this ground, independent of the compact, as well as under "the power to regulate commerce among the several states," congress had a right to declare, as in the act of 1796 they have declared, that these streams should remain free, &c. It is true the United States held the proprietary right under the act of cession, and also the right of sovereignty until the state government was established; but the mere proprietary right, if it exist, gives no right of sovereignty. The United States may own land within a state, but political jurisdiction does not follow this ownership. Where jurisdiction is necessary, as for forts and arsenals, a cession of it is obtained from the state. Even the lands of the United States, within the state, are exempted from taxation by compact. Jurisdiction over these rivers is vested in the local government, subject to the provisions of the compact. What legislative power congress may exercise over these rivers, under the power to regulate commerce among the several states, it does not seem to be necessary now to determine. Any law on this subject must be general in its provisions and consequently apply to all the states. The law of 1798 does not purport to be an exercise of power under this provision of the constitution.

We come now to enquire whether the complainant, under the circumstances of the case, and in the form presented, is entitled to an injunction. It is objected in the first place, that the complainant being a citizen of Massachusetts is not a party to the compact. That this instrument was formed between the original states and the people of the territory and of the states which should be formed within it. The force of this objection is not perceived. Under no circumstances can it be material for any one, who asks relief under the compact, to show that he is a party to it. The complainant is a citizen of the state of Massachusetts, which gives him a right to sue in this court, and if he bring himself within the rule which authorizes an injunction, he may ask it though no party to the compact. The injunction is not asked on the sovereign power of the state, but on certain individuals assuming to act in behalf of the state. This course of proceeding is fully sustained by the principle settled by the supreme court of the United States in the case of Bank of U. S. v. Osborn, 9 Wheat. [22 U. S.] 733. Must the right of the complainant be established at law, before he can claim an injunction? This is earnestly contended by the defendants. Whatever doubts may have formerly existed on this subject, there seems to be no ground for any at this day. The injunction is issued because, under the circumstances of the case, it is the only adequate remedy. In cases of an alleged violation of copy right, it is often resorted to. And in the case of the Universities of Cambridge & Oxford v. Richardson, 6 Ves. 689, Lord Elden remarked, "It is said that in cases of this sort the universal rule is, not to grant or sustain an injunction until the right is made clear at law. With all deference to Lord Mansfield, I cannot accede to that proposition, so unqualified. There are many instances in my own memory in which the court has granted or sustained injunctions to the hearing, under such circumstances." And he also observes in the same case, "If there be a number of mills

upon a stream, each having a right to the water, at the instance of any one the court would enjoin." Where waste is threatened, the party has a right to an injunction to prevent the mischief. Gibson v. Smith, 2 Atk. 182. In the case of Lane v. Newdigate, 10 Ves. 194, an injunction was granted to restrain the use of the water, so as not to injure the plaintiff's manufactory. And in the case of Gardner v. Village of Newburg, 2 Johns. Ch. 164, the court say, "that chancery has concurrent jurisdiction with a court of law, in cases of private nuisances." The diversion of water courses, is a common case for the exercise of this jurisdiction. 2 Vern. 390; 1 Vern. 120, 127, 275; 16 Ves. 338. There are some cases in the books where the chancellor has refused an injunction, until the right was established at law. Reid v. Gifford, 6 Johns. Ch. 19; 7 Johns. Ch. 162; 6 Ves. 51; 7 Johns Ch. 314. But these cases are clearly distinguishable from others, where the injunction is held to be the proper remedy.

Does the complainant bring his case within the principle, on which this extraordinary interposition of the court is given? An injunction is granted to prevent an irreparable injury. In other words, an injury for which an action at law might not give complete redress. And the principle is well illustrated by an injunction to prevent the diversion of the flowing of water to a mill, which would destroy its value. The foundation of this jurisdiction is the necessity of a preventive remedy, where great and immediate mischief or material injury would arise to the comfort and useful enjoyment of property. The interference rests on the principle of a clear and certain right to the enjoyment of the subject in question, and an injurious interruption of the right which, upon just and equitable grounds, ought not to be prevented. 1 Vern. 120, 127, 275. This preventive remedy is never given against an ordinary trespass, for in such case the law will afford adequate redress. But where an action at law, from the nature of the injury, cannot give that full and ample indemnity which the party is justly entitled to, he may ask the interposition of chancery to prevent the injury. In 7 Johns. Ch. 314, the chancellor says—"An injunction is not granted to restrain a mere trespass, where the injury is not irreparable and destructive of the plaintiff's estate; but is susceptible of perfect pecuniary compensation, and for which the party may obtain adequate satisfaction in the ordinary course of law. It must be a strong and peculiar case of trespass going to the destruction of the inheritance, or where the mischief is remediless, to entitle the party to the interference of the court by injunction." This is the principle on which this remedy is given. Does the case made by the complainant come within the rule? He presents his rights, which are threatened to be invaded, in two aspects: (1) As a citizen of the United States, he claims the right of the free navigation of the Maumee river, which the proposed dam or dams would destroy. (2) That he owns a tract of land on the river, and a small island in it, the value of which would be materially injured, if not wholly destroyed, by the obstructions to the navigation of the river.

As it regards the first ground, whatever rights the complainant may set up as a citizen of the United States, under the compact to navigate the river, it would seem to afford no ground for this extraordinary interference of the court. This right is in fact not impaired or practically affected unless he, as a citizen of the United States, is about to navigate the river. No such allegation is contained in the bill. It is then an abstract right which he asserts, and which he may never practically exercise. A court of chancery never deals with abstractions, but acts upon existing and practical rights, and prevents impending wrongs. It will enjoin, as before stated, only to prevent an irreparable injury—and that cannot be considered as such an injury, which depends on a future contingency, such as the exercise of an abstract right. If the complainant shall, at any future time, think proper to attempt to navigate the river, and shall be prevented from doing so, by the dam or dams now threatened to be erected, or shall suffer injury from such dam or dams in his vessel or cargo, he may well claim damages for the injury. In this way can this right of navigation, which is common to all the citizens of the United States, be practically asserted.

The other ground requires a more particular examination. The complainant states that he purchased the property situated at the head of the rapids, as above described, at a very large price, with a view to the navigation of that part of the river extending from the head of the rapids to Fort Wayne, and especially because it is situated at the lower termination thereof, which benefits he claims are secured to him by the ordinance and law of congress before mentioned, and the constitution of the United States. "That there is an extensive and valuable water power upon the property, afforded by the rapids of the river which commence at said point. Two extensive saw mills and one flouring mill have already been erected thereon, and it was the expectation of the complainant that many others would speedily be erected, and he believes they still would be, but for the anticipated effects of said dam or dams, which are threatened to be located above. That said dam or dams are intended to be erected some miles above his property, and that the effect thereof would be to greatly obstruct, if not entirely cut off and destroy the navigation of the river, throughout the entire distance between the foot of the rapids and Fort Wayne. That the value of his property would be thereby greatly lessened, if not wholly destroyed, and his right as a citizen of the United States to navigate said river without obstruction, hindrance or payment of toll, would be violated and rendered of little or no practical value whatever. And he insists that the dam or dams would be a

public nuisance, and that, as such, their erection should be arrested by the interposition of the court."

From the case stated by the complainant it is clear that he considers the dam or dams as a public nuisance, and that he as a citizen of the United States, being entitled to the free navigation of the river, has a right to prosecute for this nuisance, and ask the court to enjoin the defendants. No individual has a right to prosecute for a public nuisance in his own name, or at his own instance, in this form of action, unless such nuisance be irreparably injurious to himself. The United States through their law officer might well ask to have this nuisance, if it shall be one, abated; but the special and private injury to an individual is the only ground on which he can ask for relief against it. 18 Ves. 215; 6 Johns. Ch. 439; Attorney General v. Nichol, 16 Ves. 338. In the case of City of Georgetown v. Alexandria Co., 12 Pet. [37 U. S.] 98, the supreme court say, as the result of the cases examined, "a court of equity will now take jurisdiction of a public nuisance, at the instance of a private person; where he is in imminent danger of suffering a special injury, for which, under the circumstances of the case, the law would not afford an adequate remedy." And in the case of Crowder v. Tinkler, 19 Ves. 616, the chancellor says, "the complaint is therefore to be considered as of not a public nuisance simply: but what, being so in its nature, is attended with extreme probability of irreparable injury to the property of the plaintiffs, including also, danger to their existence, and on such case clearly established I do not hesitate to say an injunction would be granted."

We have already considered the more abstract right of navigating the river, secured to every citizen of the United States, as too remote and contingent, for the special interference of the court. The right may exist absolutely, in the abstract, but whether it will ever be exercised is wholly contingent. If the complainant were actually engaged in plying a steam boat or other vessel, between Fort Wayne and the rapids, he would at least present a tangible case, by showing the exercise of a right which would be destroyed by the construction of the works complained of. It is a public nuisance to obstruct a highway, on which every citizen has a right to travel; but can any citizen on the ground of this right, ask a court of chancery to enjoin any persons who may threaten to erect such obstruction? The individual has suffered no special injury, much less an injury that is irremediable, in any other form than by injunction. If, in attempting to travel the road, he should be prevented from doing so, by the obstruction, he would have a right to bring his action at law for damages. And this is the only appropriate redress, which an individual, under such circumstances, can have. The persons who constructed the nuisance would be liable to a public prosecution,

and in this form the redress to the public would be ample. The complainant alleges that he paid a high price for his property on account of its situation, and that its value will be greatly injured if not wholly destroyed by the dam or dams which the defendants are about to build. But he does not state how this consequence will follow. If it result from destroying the navigableness of the river, is it not easy to state in what manner it injures his property? Has he a landing place on his ground, a place where the produce transported on the river is deposited, or what other facts or circumstances shew that the value of property depends upon the navigation of the river? It is not enough for the complainant to say, generally, that he will be injured by the construction of the works; but he must state how his property will be injured. This is the turning point in the case; the ground on which the injunction must be allowed, if it shall be issued. The complainant does not complain that the flowing of the water is diverted or will be diverted from his mill, so as to injure it; or that the volume of water will be so reduced as to prevent the construction of other mills. No special injury of any kind is alleged but, generally, that the obstructions would injure the value of his property. This may be the estimate of the complainant, but by a statement of the facts on which his estimate is formed, he must enable the court to judge of its correctness. He has stated no fact going to show how the free navigation of the river, gives value to his property. Is the river a highway to his mill, and is it used for the transportation of lumber to or from the mill? This is not stated in the bill. Does the river afford the only outlet or approach to his mill? Nothing of this kind is pretended. How then does the proposed obstructions on the river, inflict on the complainant an irremediable injury? The court do not see how such an injury is inflicted, and the complainant has failed to enlighten them on the subject.

In the case of Corning v. Lowerre, 6 Johns. Ch. 439, an injunction was granted to restrain a defendant from obstructing a street, in the city of New York, by building a house thereon; it being not only a public nuisance, but producing special injury to the plaintiffs by affecting the enjoyment of their property in the vicinity, and the value of it. In that case there was an intimate connection between the enjoyment of the property and the street which led to it; and this was shown by the facts of the case.

In the case of Attorney General v. Nichol, 16 Ves. 338, the chancellor said, that an injunction against darkening ancient windows cannot be sustained in every case affecting the value of the premises, that would support an action. The effect must be, that material injury amounting to nuisance, which should not only be redressed by damages, but upon equitable principles prevented. And in 7 Johns. Ch. 314, where an injunction was re-

fused, the chancellor says—"The plaintiff does not aver that the ledge of stone or mass of rock, on which the trespass is committed, is of any essential use, or that he does or can apply it to any valuable purpose. It cannot be compared then to a lead or coal mine, or a quarry of marble, or a fine building, or precious stones, or a grove of timber, or a mill establishment, which the court of chancery has thought proper to protect from trespass and ruin by injunction." The court would not hesitate to enjoin the defendants, and to give effect to their decree, on a proper case being made; but the complainant has failed to show that measure of injury which calls for its special interposition by an injunction. The injunction is therefore not allowed.

LEAVITT, District Judge. The object of this bill is to obtain an injunction restraining the respondents, as the agents of the state of Ohio, from proceeding in the erection of a dam across the Maumee river, authorized as necessary under a law of the state, providing for the construction of so much of the Erie and Wabash canal, as lies within the limits of the state. The complainant alleges, that this dam, if completed, will greatly injure, if not wholly destroy, the navigation of said river, and thereby become a nuisance; and also, that it will materially lessen the value of real estate, of which he is the proprietor, lying some distance below the point, where it is proposed to erect said dam. He claims that the act of the legislature of the state, providing for the construction of said canal, so far as it may be considered as authorizing any obstruction to the navigation of said river, is in conflict with the ordinance of congress of the 13th July, 1787; and that, as the owner of property which will be injured in value by the erection of said dam, he is entitled to the preventive remedy, afforded by the process of injunction. The provision of the ordinance of 1787, in violation of which, the complainant alleges that his rights are about to be invaded, is as follows: "The navigable waters leading into the St. Lawrence and Mississippi, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of said territory, (north-west of the Ohio,) as to the citizens of the United States, and those of any other states, that may be admitted into the confederacy, without any tax, impost, or duty therefor."

It is insisted by the counsel for the respondents, that the ordinance of 1787 has been superseded, or virtually abrogated in Ohio, by the adoption of her constitution, and her admission into the Union as a sovereign state, "on an equal footing with the original states;" and that the free and uncontrolled use of the navigable water course, within her limits, pertains to her, as a necessary appendage of sovereignty. Although this ordinance, on various occasions, has been the subject of much public discussion, the question now presented has never been decided by any of the federal tribunals of the country. And the case, in the supreme court of Ohio, cited in argument, and to which reference will hereafter be made, is believed to be the only one, in which it has received a judicial consideration.

Preliminary to the examination of this memorable ordinance, and as connected with the history of its origin and adoption, it may be proper to notice, that the vast extent of country, known as the Northwest Territory, was vested in the United States, by cessions from the states, within whose chartered limits, it was embraced. The state of Virginia, claiming to hold a large portion of the territory, in sovereignty, by her deed of cession of the 1st of March, 1784, granted "to the United States, in congress assembled, all her right, title, and claim, as well of soil, as of jurisdiction" (with certain reservations and exceptions stated in the deed) "as a common fund, for the use and benefit of such of the United States, as have become, or shall become, members of the Confederation, or federal alliance of the states." The congress of the United States, thus possessed of this great domain, in trust for the common benefit, on the 13th of July, 1787, adopted the ordinance entitled, "An ordinance for the government of the territory of the United States, north west of the river Ohio." This ordinance, after making provision for a temporary government within the territory, declares, among other things, "that for extending the fundamental principles of civil and religious liberty which form the basis, whereon these republics, their laws and constitutions, are erected: to fix and establish those principles, as the basis of all laws, constitutions and governments, which forever hereafter shall be formed in the territory; to provide also for the establishment of states and permanent governments therein, and for their admission to a share in the federal councils, on an equal footing with the original states, at as early a period as may be consistent with the general interest; the following articles shall be considered as articles of compact between the original states, and the people and states, in the said territory, and forever remain unalterable, unless by common consent." Then follow the articles of compact, six in number, guaranteeing, in the most solemn and impressive forms of expression, the great principles of civil and political liberty, namely—the toleration of freedom of opinion in matters of religion; the benefits of the writ of habeas corpus; of trial by jury; and of judicial proceedings according to the course of common law; the encouragement of schools, and the means of instruction; good faith and humanity towards the Indian tribes; the right of the states formed within the territory, to admission into the Union, with certain provisions as to the number and boundaries of such states; and that neither slavery nor involuntary servitude shall be introduced, otherwise than in punishment for crimes.

In this category also is included the provision already quoted, securing the free and unobstructed navigation of the water courses therein referred to. This clause, it appears by reference to the journal of the old congress, was not included in the original draft of the ordinance. but was afterwards unanimously adopted, as an addition to the fourth article of the compact.

To form a just view of this instrument, and properly to appreciate the far-reaching designs and noble elevation of the framers, it is important to recur to the circumstances in which they were placed at the time of its adoption. That it is the production of profound minds, guided by principles of the purest patriotism, is sufficiently attested on the face of the ordinance. Many of the members of congress of '87, from which it emanated, had participated largely in the toils and trials, and were deeply imbued with the spirit of the revolution from which the country had just emerged. The nation, with her fiscal energies greatly paralyzed and her resources exhausted, was in possession of a domain, vast in extent. and in prospective value, almost beyond computation. In addressing itself to the responsible duty of disposing of this domain, congress may well be supposed to have been actuated by the twofold design of making it available for the relief of the country from her financial embarrassments, and of extending and perpetuating the great principles of national liberty, which had been involved in the struggle for independence. An enthusiastic devotion to those principles was a distinguishing characteristic of the American people, at that period; and there were thousands in Europe, in whose bosoms the same feelings glowed with equal intensity. In this state of things, it was alike the dictate of inclination, of duty, and of policy, that the principles of the government which were to exist in the Northwest Territory, should be not only distinctly and authoritatively announced and defined, but placed on a secure and an immovable basis. It was not difficult to foresee, that those in whom the doctrines of the revolution had taken deep root, and who were looking to this fertile region as the place of their permanent settlement and abode, would enquire with the most watchful solicitude, as to the securities which were provided for the enjoyment and preservation of their civil and political rights; and that nothing short of the amplest guarantys of the blessings of liberty would satisfy their wishes, and induce them to immigrate to the territory.

These are some of the considerations, from which, if the language of the ordinance on this point was doubtful or ambiguous, the inference would be sustainable, that it was the design of its framers, to make its leading principles and requisitions, of perpetual obligation on those who then were, or should afterwards become, the parties to it. But, if regard is had to the language of the ordinance, no room is left for inference or conjecture, as to the design of congress in its adoption. When it is

declared to be the intention of the articles of compact to extend the "fundamental principles of civil and religious liberty," and "to fix and establish those principles, as the basis of all laws, constitutions and governments, which forever hereafter shall be formed in the said territory," there can be no hesitancy in saying, it was designed to lay a strong and enduring foundation, on which the structures of government in the territory, should be based.

In the arguments submitted in this case, no attempt was made to maintain the position, that the congress of '87 had transcended its powers, in the enactment of the ordinance for the government of the Northwest Territory. Nor is it supposed that a doubt can exist, as to the competency of that body to prescribe the principles on which states formed within the territory might be admitted into the Union; or to propose as matters of compact, stipulations, which should be obligatory on the states, as members of the confederacy. The only point of enquiry therefore. in reference to this branch of the case, is, whether the ordinance has been superseded and rendered inoperative, in whole or in part, within the state of Ohio. In looking into the ordinance, it is obvious, that all the provisions of the articles of compact, are not to be viewed as standing precisely on the same footing. The guaranties for the security of the great principles of liberty, which lie at the foundation, and constitute essential elements, of all true republican governments, are obviously to be regarded in a different light from those which pertain merely to the right and possession of property, and its advantageous enjoyment. This distinction seems to have been recognized by the framers of the constitution of Ohio, and to have exerted an influence upon them, in framing that instrument. They evidently acted under a belief, that the fundamental law of the state, must conform, in all its leading features and principles, to those of the ordinance of '87. But, while they were careful to impress those features upon, and incorporate those principles into the constitution of Ohio, they did not deem it necessary or proper, to treat all the provisions of the ordinance. as entitled to the same high consideration. Hence no reference is made in the constitution to that provision of the ordinance relating to the navigability of water courses;—and for the plain reason, that this was not necessary, in order to give to the constitution a republican character, and make it conform to the great principles declared in the ordinance.

Considering the distinction here indicated, as well taken, the conclusion to which it points, is, that in so far as the constitution of Ohio has embraced, and secured the perpetuity of the essential principles of free government, set forth in the ordinance, the latter instrument may be considered as superseded, within the state. In the preamble to the bill of rights, forming a part of the constitution of Ohio, it is declared, that the principles which it asserts shall be "forever unalterably

established." To this extent, therefore, it may be conceded, that the great purposes of the ordinance are effected and amply secured; and that to this extent, its operation may be considered as at an end. Whether, in the event of a change in the constitution of Ohio, by which its provisions would be made to conflict with the ordinance, it would be possible to apply a corrective to the evil, is not a question involved in this case. Nor would it be either profitable or proper to engage in its discussion. From the well known attachment of the people of Ohio, to the republican principles of her constitution, the hope may be justly indulged, that they will never consent to, or tolerate any change in the fundamental law of the state, by which it will be brought into conflict with the ordinance of '87.

Conceding that the articles of compact contained in the ordinance have been superseded or suspended, in the manner and to the extent indicated, it is not perceived, that the provision respecting the free navigation of water courses, can be viewed as coming within the operation of the principle stated. If the provision can be considered as inoperative within the state of Ohio, it must be upon one or both of the following grounds: (1) Because congress in accepting the constitution of Ohio, as submitted for the approval of that body, is thereby to be presumed to have given the assent of the parties, to the abrogation of the provision referred to, or (2) because, the right claimed under that provision, is a necessary appendage of sovereignty, and cannot exist elsewhere than in Ohio, but in derogation of her rights and standing, as a sovereign and independent state.

1. As to the first of these propositions, it may be remarked, that there is no pretence that the parties to the compact, by any action on the part of congress, or otherwise, have given any express assent to the repeal or abrogation of the guaranty respecting the navigation of rivers; and, that if it is to be viewed as inoperative, that result is to be made out, altogether by implication.

It is proposed to enquire, very briefly, whether in fact, or in law, there is any thing which warrants such an implication. In April, 1802, upon the application of the people of that part of the territory north-west of the Ohio, now embraced within the limits of the state of Ohio, congress passed a law to enable them "to form a constitution and state government, and for the admission of such state into the Union, on an equal footing with the original states, and for other purposes." This act provides among other things, for holding a convention of the people of that part of the territory; and authorizes such convention to form a constitution and state government, provided, the same shall be republican, and not repugnant to the ordinance of the 13th July, 1787. This provision is adverted to, as evidencing, that the congress of 1802 most distinctly recognized the obligatory character of the ordinance, and as containing an unequivocal expression of the opinion, that no state within the territory could be organized, and admitted into the Union, with a constitution "repugnant" to that instrument. That body did not consider itself as vested with the power to absolve the state of Ohio from the obligations created by the compact. Nor can it be doubted, that if the constitution of the state had been submitted to congress with a provision, that the use and control of the navigable water courses within her limits, should rest exclusively in Ohio, that the instrument would have been rejected, as in conflict with the ordinance. It is also clear, that the people of Ohio in calling a convention and adopting a constitution, under the act of congress of April, 1802, recognized the ordinance as affording a paramount rule for their guidance. This is deducible from the fact that in the preamble to their constitution, the right of the state to admission into the Union is based upon the ordinance, the constitution of the United States, and the act of congress just referred to. The constitution of Ohio thus formed and embodying, as has been seen, the great and leading doctrines of a free government, as set forth in the ordinance, but containing nothing on the subject of the free navigation of water courses, was submitted to congress, and approved by that body as "republican," and not "repugnant" to the ordinance. And the state was thereupon admitted into the Union.

If it be conceded that congress possessed the competency of giving the assent of the parties to the compact, to the abrogation of any of its provisions, it is not perceived that the action of that body affords any just ground to infer any intention to do so in the case referred to. Nor, is there any reason to conclude that the convention of Ohio supposed the state had, by her admission into the Union, obtained a release from the obligation imposed by the provision of the ordinance under consideration. These bodies seem to have a constant reference to this instrument; and both in the most solemn and deliberate manner recognized its obligatory character. And hence, so far as it pointed out the landmarks of a free government, it was deemed necessary that the constitution of Ohio should embody its principles. It was, doubtless, one of the great purposes of the ordinance, to afford a directory to the states to be formed within the territory, in the construction of their governments; and the principles which it laid down were regarded as the tests by which the republican character of a state constitution was to be decided. But, as the provision in relation to water courses would remain and be of perpetual obligation, in virtue of the ordinance, there was no necessity that the constitution of Ohio should contain a distinct recognition of its obligatory character. From the language in which this guaranty is couched, and the nature and extent of the interests affected by it, the inference of any intention on the part of congress to assent to its abro-

gation in Ohio, is strongly rebutted. The terms of this part of the compact are, that the water courses referred to "shall be common highways, and forever free, as well to the inhabitants of the territory, as to the citizens of the United States, and those of any other state that may be admitted into the confederacy." In duration, the benefits which it intended to secure, were without any limit; in extent, they were to be common, to the inhabitants of the confederacy as it then existed or might afterwards exist. All were interested in this provision, since all might have occasion to navigate the rivers referred to. Is it rational to conclude, that congress intended to surrender a right so solemnly secured, so important in its character, and so extensive in its operation? And is such an intention to be predicated of any action, short of an express declaration to that effect? If an ordinary act of legislation cannot be repealed without the observance of the forms and solemnities requisite, a compact declared on its face to be "unalterable, unless by common consent," cannot be abrogated by mere implication.

2. The next enquiry is, whether the right set up, in behalf of the state of Ohio, is a necessary appendage of sovereignty, so that it cannot exist elsewhere, but in derogation of her character and standing, as a sovereign and independent state. The affirmative of this proposition has been strenuously and ably urged by the counsel for the respondents; and, its importance commends it to the attentive consideration of the court. It may be readily conceded, that if the congress of '87, professing to provide the means for the formation of state governments, and the admission of states into the Union, on a footing of equality with the other states, have prescribed and annexed conditions, so repugnant and incongruous, as to defeat the ends that were in view, thus far its acts may be regarded as nullities; since, to that extent, that body must be viewed as having transcended its powers. In consistency with the terms and intentions of the acts ceding the territory to congress, that body could not attach conditions to the admission of states, that would be degrading to them, by detracting from their standing, as sovereign states.

It may relieve this subject of some of its apparent difficulties, to settle precisely, the character and extent of the restriction upon the state, created by the ordinance, in reference to her navigable water courses. For, in accordance with the views here briefly presented, and which will be given more at large, in a subsequent part of this opinion, it is not "necessary to insist upon, or vindicate, a construction of the ordinance, which shall take from the state, all control over her navigable streams." The guaranty on this subject is viewed as restrictive of the power of the state, to commit a public wrong, in authorizing or permitting obstructions and hindrances, to the navigation of her streams, by actual impediments, or the imposition of tolls or duties. There is an obvious distinction, between the right to destroy navigation, and the right or power, to improve it. The imposition of a toll or duty, for the use of any of the streams referred to, by the ordinance, in their natural state; or, the erection of any fixture, that would destroy or injure the utility of such a stream, for the purposes of navigation, would be in violation both of the letter and spirit of that instrument. And the cases here supposed are precisely such, as it intended to prevent. But, the erection of a dam, designed for, and "tending to, the improvement of navigation, by affording increased facilities for commercial intercourse," so far from being opposed to the ordinance, would be in furtherance of the purposes had in view by its framers. Looking at this subject in this light, it is not perceived that the recognition of the obligatory character of the provision of the ordinance, under consideration, so far detracts from the rights of sovereignty, in Ohio, as to warrant the conclusion, that she is not sovereign, in any just sense of that term. To entitle a state to that character, it is not regarded as essential, that she should possess, in an equal degree, the same powers, over all subjects, that may be possessed by other states. In any other aspect of this subject, no one of the states formed within the territory north-west of the river Ohio, has been admitted into the Union, on a footing of equality with some of the original states. The institution of slavery existed in many of the original states, at the period of the adoption of the ordinance of '87; and, in several of them, it continues to exist. Yet, the ordinance expressly inhibits the introduction of slavery in any of the states to be formed within the territory; and these states have made this provision of the ordinance, a part of their constitution. In this case then, it is clear, that some of the original states possess rights, and exercise a species of jurisdiction, which is prohibited to Ohio, and other states. And yet, can it be maintained, that the latter states are not equally sovereign with the former?

It may be well on this point, to refer to the language of the ordinance, to ascertain in what light this subject was viewed, by those who framed and passed it. To suppose them ignorant of the political rights and relations of the state, or that they misconceived the powers with which they were clothed, would be doing them great injustice. Under a form of government, in which the congress represented the states, in their sovereign capacities, it may be safely inferred, that the rights of the states, were not only well understood, but scrupulously guarded. And, in making provision "for the establishment of states and permanent governments" within the territory, and "for their admission to a share in the federal councils, on an equal footing with the original states," it is to be presumed they intended what the language imports. Nor is it

to be conceived, that they would annex a condition to the admission of a state, repugnant to, and inconsistent with, the declared purpose of providing for the admission of new states, on an equal footing with the old states. And the inference is therefore irresistible, that while congress intended to make the guaranty, on the subject of water courses, perpetually obligatory, the intelligence and sagacity of that body, did not lead to a suspicion, that it detracted, in any degree, from the sovereignty of the states, that might be admitted into the confederacy, in virtue of the ordinance. Again:—By the terms of the ordinance, the states admitted into the confederacy, thereupon became parties to the compact. It has been already remarked, that the congress of 1802, in providing for the admission of Ohio, and the convention of that state, in adopting a constitution, and submitting it to congress, distinctly recognized the obligatory character of the ordinance. The state became a voluntary party to the articles of compact which it contained; one of which embraced the stipulation, that certain navigable streams within her limits, should remain forever free for public use. It was optional with the state, to assent to, or refuse this condition; but having assented to it, and acknowledged its binding character, she is concluded from taking the ground, that it imposes no obligation upon her. Suppose that in addition to the terms of the compact, it had been declared, that a portion of the profits and benefits to be derived from mines of lead, gold and silver, discovered in the territory, should be forever reserved to the United States for the common benefit? Would not such a provision be obligatory on a state, coming into the Union, as a party to such a compact; and would it be competent for her to insist, after her admission, that such reservation was inconsistent with her rights as a sovereign state, and therefore, void? Again:—By a compact between the United States, and the state of Ohio, the latter has obligated herself, not to tax lands sold by the government, for the term of five years after the sale. Upon the ground assumed by the respondent's counsel, she is not bound by this compact. For, the right of taxation is one of the highest incidents of sovereignty; and yet, the obligatory character of this compact, has never been seriously questioned. If a state, may in this way, yield her right to tax property within her limits, may she not also, in perfect accordance with her character and standing as a sovereign state, agree to forego the exercise of a jurisdiction over her water courses, which she would otherwise possess?

These considerations seem fully to warrant the conclusion, that the provision of the ordinance of 1787, in relation to the free use and navigation of water courses, has not been superseded or abrogated, in Ohio; and, that neither the state, or an individual, has a right practically to destroy or obstruct their navigation.

It is believed, the views here presented accord with those which have prevailed in Ohio, from the earliest period of her history. All the departments of her government have recognized the sacred and inviolable character of that part of the ordinance of 1787, which is now under review: nor is any instance known, in which the position assumed by the counsel for the respondents, has been seriously urged. It is true, the legislature has not considered the state, so entirely prohibited from all control over the navigable streams within her limits, as to deprive her of all power to authorize improvements, which instead of obstructing or injuring, would improve and facilitate, navigation, and thus promote, the great purposes intended by the ordinance. In some cases, with a view to such results, individuals have been authorized by law, to erect dams upon streams, that may be considered as within the contemplation of the ordinance; but always, upon the condition, that locks shall be constructed and kept in repair, so as not to detract from the utility of the stream, as a navigable water course. The act, authorizing the Erie and Wabash canal cannot be viewed as an exception to the principle: for, although the act confers, by necessary implication, the power of using and diverting the water of navigable streams, as subsidiary to the accomplishment of the main purpose intended by the law, it is not to be inferred therefrom, either that it was designed to injure, or that in fact, it will injure, the interests of navigation.

But the question, as to the force and effect to be given to the provision of the ordinance under consideration, has been settled by the decision of the supreme court of Ohio. In the case of Hogg v. Zanesville Canal & Manuf'g Co., 5 Ohio, 416, in which the point was before the court, the judge says, "that this portion of the ordinance of 1787, is as much obligatory upon the state of Ohio, as our own constitution. In truth it is more so; for the constitution may be altered by the people of the state, while this cannot be altered without the assent, both of the people of this state, and of the United States, through their representatives. It is an article of compact, and until we assume the principle, that the sovereign power of a state is not bound by compact, this clause must be considered obligatory."

Another very important enquiry arises in this case, which may be stated thus: Admitting the provision of the ordinance under review to be obligatory, does the case made in the complainant's bill involve its violation, so as to entitle him to the remedy sought for? The grievance complained of in this case is, that the erection of the proposed dam across the Maumee, will greatly injure, if not wholly destroy, the navigation of that stream, and deprive the complainant of the benefits he expected to derive therefrom, and in contemplation of which, he purchased his land at a high price; and that his land will be materially lessened in value, as also the mill seats

upon it, and that the dam will be a public nuisance.

The facts necessary to a full understanding of this part of the case, are not very satisfactorily stated in the bill. It is, however, understood to have been conceded in the argument, that in the construction of the Erie and Wabash Canal, authorized by the legislature of Ohio, the canal commissioners have deemed it necessary to erect one or more dams across the Maumee, for the purpose of supplying the canal with water. That this canal is designed as a channel of commercial intercourse, between Lake Erie and the interior of the state of Indiana; and that it is located along or near to the Maumee river. And in connection with these facts it should be stated that the land of the complainant lies at some distance below the point where it is proposed to erect the dam, or dams. It becomes a material inquiry in the case, whether the erection of a dam, under the circumstances, and for the purpose stated, is an obstruction to the navigation of this stream, within the spirit and meaning of the ordinance. Some views in support of the negative of this proposition have already been incidentally thrown out; but it is proposed to say something additionally, in confirmation of the position assumed.

Referring to the case already noticed, reported in the 5th volume of the Ohio Reports, it is found that this point also arose, and that the court decided, that a dam or other fixture, on a stream, which was substantially an improvement of navigation, could not be regarded as such an obstruction or impediment as was within the contemplation of the framers of the ordinance. In looking at the provision of that instrument on this subject, it is apparent, that it was designed to prevent, first, actual impediments and obstructions by dams or other fixtures; second, impediments and obstructions resulting from the imposition of "any tax, imposts, or duty."

It will assist materially in giving a just and enlightened interpretation to this provision, to ascertain the intentions of those by whose sanction it was made a part of the ordinance of '87. And to this end, it seems proper to refer to the actual state of things at the time that instrument was adopted. Although the geography of the territory north-west of the Ohio was imperfectly known at that period, it was well ascertained that there were rivers and lakes, within its limits and upon its confines, formed on a scale of grandeur unknown in any other portion of the globe. The prospectice importance and utility of those great natural water courses and basins as affording the means of commercial intercourse throughout that vast, and fertile region, were fully appreciated. And as an inducement to immigration, it was justly deemed of moment that the future and uninterrupted enjoyment of these great facilities and advantages, should be placed upon a secure basis. Foreseeing that the time would come when between the lakes on the north, and the Mississippi and its tributaries, there would be much intercommunication, it was deemed important to guard against these obstructions; and hence, doubtless, the reason for the provision securing the right of way along the "carrying places, or portages, between the waters of the streams emptying into the lakes, and those which flowed into the Mississippi." And it may not be inaptly suggested, that the political condition and prospects of the country had an influence upon the congress of '87, in placing those guards around the navigation and commerce of the West. Under the articles of Confederation then existing, there were well founded apprehensions, if that form of government should continue, that harmony among the states would not be preserved; and that hostile interests and hostile collisions would be engendered. And in the event that the states formed in the West should be thrown into this position, in regard to other portions of the confederacy, there was danger, that in a spirit of aggression or retaliation, they might adopt measures excluding the citizens of their adversary state or states from a participation in the benefits of navigating the Western waters. To prevent, by solemn compact, such an occurrence, was probably one of the purposes of the provision referred to. Certain it is, the clause under review was designed for good, and not for evil. So far as it was intended to restrict the action or power of states or individuals, it was to disable them from the infliction of public injury. The people of the United States were not to be deprived of the use of the water courses in the Northwest Territory, by any unjust or wanton exercise of power over them: but it was not contemplated that the hands of the states should be so tied up, as that it should not be in their power to remove a natural impediment to navigation, or avoid such an impediment, by canals or other improvements. A contrary construction would be a perversion of the great and primary design of the clause. It would embarrass, if not entirely arrest, some of the great works of internal improvement, in progress or projected, in the West. It would place it in the power of a single individual to thwart the wishes, and seriously to injure the interests, of entire communities and states. Take the case before the court as an illustration of the consequences of such a doctrine. By the joint and simultaneous action of the states of Ohio and Indiana, the Erie and Wabash Canal has been authorized and commenced. It is designed as a channel of intercourse between Lake Erie and the interior of Indiana; and when completed, will be greatly promotive of the interests, not only of those states, but of a large portion of the Union. To sanction the doctrine, that for purposes so beneficent and patriotic, it is not competent for those states to use or control the waters of their navigable streams, would be pregnant with the most injurious results. For, it should be borne in mind, that if this power does not exist in these states, it exists no-

where. The same reason for denying it to the states applies with equal force to the congress of the United States. That body, as the representative of the people of the United States, is a party to the compact, and as much bound by its stipulations, as the states individually. If, therefore, the ordinance is to receive a construction, that shall tie up the hands of all the parties to the compact, from making any improvements in navigation in the West, a fatal blow will have been inflicted upon the prosperity of that region. Upon this principle, if a rapid or other natural obstruction occurs in a stream, otherwise navigable, it is not competent to resort to the instrumentality of a dam, for the purpose of making an artificial channel, whereby to avoid such obstruction. And by a parity of reasoning, it would not be competent for a state to authorize the construction of a rail road, or turnpike, over or along any of the "portages or carrying places" referred to in the ordinance, and thereby hinder the free and common use of the same, by the imposition of tolls, as a compensation for the benefits of such improvements. Such a construction of that instrument, would be subversive of one of its leading designs.

It is no answer to the views here thrown out to say, that these improvements, when completed, will subject those who use them, to the payment of a "tax, impost, or duty." The object of the ordinance so far as it provides an exemption from these charges was to prevent the imposition of any duty for the use of the streams and carrying places referred to, in their natural state; and it might also be justly extended in its meaning, so as to prevent onerous and oppressive tolls or exactions, for their use, in an improved state. Reasonable tolls, imposed and paid, for the use of a canal or artificial road, are not to be viewed as unjust exactions; but as a fair compensation, in consideration of the increased facilities for trade and intercourse, afforded by such improvements.

According to this view of the subject, the right of the complainant to the process of injunction, is to be settled, upon principles wholly unconnected with, and irrespective of, the ordinance of '87. For, although, upon the case made he can claim nothing in virtue of the compact contained in that instrument, yet, if he brings himself within the principles, on which courts of chancery are wont to interfere, he is entitled to the relief sought for.

The case, then, is to be viewed merely as an application for an injunction to prevent an apprehended injury to complainant, from the erection of the dam mentioned in the bill, in connection with the allegation, that such dam will be a public nuisance. In the case of City of Georgetown v. Alexandria Canal Co., 12 Pet. [37 U. S.] 91, the doctrine is laid down, "that in case of a public nuisance, where a bill is filed by a private person, asking for relief by way of prevention, the plaintiff cannot maintain a stand in a court of equity, unless he avers and proves some special damage." And it is also recognized as an undoubted principle of law, in that case, that an obstruction to a navigable stream, is a public nuisance. In the case of Putnam v. Valentine, 5 Ohio, 188, it is said by the court, that "chancery jurisdiction extends to restrain the doing of an act, from which irreparable damage to individuals, or great public injury, would ensue." The same principle is asserted and recognized, as the law in England. Eden, Inj. 157.

The question, whether a court of chancery, upon the application of an individual, will interfere to prevent what is alleged to be a public nuisance, unconnected with a special injury to the complainant, does not arise in this case. The grounds upon which the complainant seeks relief are, that the dam mentioned in the bill, will be a public nuisance, and will be attended with a private injury to himself. And, if an injunction can be awarded, it must be, upon both, or the latter, of these grounds.

The question, whether the erection of the dam mentioned in the complainant's bill, will amount to a public nuisance, has already been considered, and the conclusion announced, namely, that the diversion of a portion of the water of a navigable stream, effected by means of a dam thrown across the river, for the purpose of supplying a canal, designed for the improvement of navigation, cannot be viewed as such an obstruction, as entitles it to the character and designation of a public nuisance. In 3 Bl. Comm. 216, it is said, "that public or common nuisances (are those) which affect the public, and are an annoyance to all the king's subjects." According to this definition, a public nuisance must threaten, or be attended with effects, detrimental to the community, to an extent rendering it necessary, that the law should interfere, to prevent it, if not already established, or to abate it, if established. So far then, as the public is concerned, can it be predicated of the obstruction complained of in this case, that it will be a nuisance? But, upon the authority of principles settled, both in this country and in England, it may be said, that cases may exist in which the preventive remedy by injunction may be had, to avert the doing of an act, which will be attended with injury to an individual. In all this class of cases, however, the principle universally obtains, that the act complained of, must be attended with irreparable damage or injury to the complainant; or that there is an extreme probability of such a result. Thus, in the case of Crowder v. Tinkler, 19 Ves. 616, an injunction was granted, to restrain the defendant from the erection of a powder house near the complainant's premises; not on the ground of its being a public nuisance, but of great danger to complainant from such erection. And in the case of Earl of Ripon v.

Hobart, 8 Cond. Eng. Ch. 331, the lord chancellor said, "I can see no ground whatever, therefore, for granting an injunction of this description, which fails in the very point that forms the ground of relief—the preventing irreparable mischief." And in the same case this rule is laid down. "If the thing sought to be prohibited is in itself a nuisance, the court will interfere to stay irreparable mischief, without waiting for the result of a trial—but where the thing sought to be restrained, is not unavoidable, and in itself noxious, but only something which may. according to circumstances, prove so, the court will refuse to interfere, until the matter has been tried at law; generally by an action: though in particular cases, an issue may be directed for the satisfaction of the court, where an action could not be formed so as to meet the question." Has the claimant presented a case involving the certainty, or extreme probability of irreparable mischief, from the doing of the acts complained of in his bill, so as to entitle him to the relief sought for, within the principles here laid down?

The bill contains no direct allegation, that the injury which the complainant apprehends from the erection of the dam, will be irreparable in its nature. And the court is left to deduce that, as a necessary result from the facts stated in the bill. These facts are,—(1) That he purchased his land at a high price, in contemplation of the advantages of navigating the Maumee to Fort Wayne. (2) That there is a valuable water power on his land; that two saw mills and one flour mill have been erected on it, and more would have been erected, but for the erection of the proposed dams. (3) That the value of his property will be greatly lessened. On none of these grounds can the injury complained of be regarded, as of a character which calls for the arrest of the proposed dam, by the award of an injunction. As to the first, it is sufficient to observe, that upon the principle assumed, that the dam will not be a public nuisance, the deprivation of the advantage which the complainant anticipated from the navigation of the Maumee, affords no ground for issuing an injunction. It is an immunity, the value of which must necessarily depend on circumstances: and when it is sought to make it the basis of the relief here asked for, its value and importance to the complainant, must be satisfactorily proved. As the subject is here presented to the court, this immunity is of a character, so vague and intangible, that it cannot, in this form, be considered a proper matter for judicial cognizance. The same vagueness and uncertainty attaches to the allegation concerning the injury apprehended to the mill seats of the complainant. There is no pretence, that the erection of the dam will withdraw or divert the water, in such a manner as to injure or detract from the value of his water privileges: or that, it will be attended with any overflow of water, upon his land: —but the grievance is, that the apprehended obstruction of the river will so far lessen the probable profits of mills, as to take away the inducements to engage in that business; and thus, essentially injure the value of his land.

There is no case known, in which the process of injunction has been awarded, on such, or any similar grounds. There is nothing before the court, which warrants the inference, that the injury, which the complainant may sustain, is irreparable, except through the operation of an injunction, to restrain the respondents from proceeding further in the erection of the dam. And upon the authority of numerous cases on this subject, it is clear, that this remedy cannot be afforded, except upon the ground of irreparable mischief or injury to the complainant. If the injury which the complainant apprehends should result from the completion of this public improvement, he may have a remedy in another form. He may be enabled, either by an appeal to the legislature of the state, or by an action at law, to obtain a redress of the grievances complained of: but, in the form, and under the circumstances, in which the case is before this court, he is not entitled to the process of injunction.

NOTE. On overruling this motion for an injunction, the counsel for the complainant prayed an appeal: but the court suggested that an appeal would lie only on a final decree; and that this being merely the decision of a motion for an injunction, no appeal would lie from it. The court expressed a strong desire, as the principles of this case, were important to the state, that it should be taken to the supreme court without delay. and proposed and indeed recommended to the counsel for the state to file a demurrer. that a final decree might be entered and the cause be immediately taken to the supreme court by appeal. But the counsel declined filing the demurrer, and as they had not been ruled to answer by the complainant, they were not bound to answer or demur. The cause was, consequently, continued.